## THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| PETER E. and ERIC E., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED HEALTHCARE SERVICES, INC., UNITED BEHAVIORAL HEALTH, and KEYSIGHT MEDICAL PLAN, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [105] PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING [107] DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 2:17-cv-435-DBB-DAO <br><br> District Judge David Barlow <br><br> Magistrate Daphne A. Oberg |

Defendants United Healthcare Services and United Behavioral Health (referred to collectively as United) denied Plaintiffs' claims for healthcare reimbursement under an employee welfare benefits plan. Plaintiffs contend that their claims were wrongly denied under the Employee Retirement Income Security Act of 1974 (ERISA).[1] They also contend that United's administration of the employee welfare benefits plan violated the Mental Health Parity and Addiction Equity Act of 2008 (Parity Act).[2]

Before the court are the parties' cross-motions for summary judgment.[3] Having considered the briefing and the relevant law, the court concludes the motions may be resolved without oral argument.[4]

---

[1] *See generally* 29 U.S.C. § 1001, *et seq.*

[2] *See* 29 U.S.C. § 1185a.

[3] Plaintiffs' Motion for Summary Judgment, ECF No. 105, filed June 1, 2021; Defendants' Motion for Summary Judgment, ECF No. 107, filed June 1, 2021.

[4] *See* DUCivR 7-1(f).

# BACKGROUND

Eric E. receives health insurance coverage through the Keysight Medical Plan (Plan), which is sponsored and maintained by his father's (Peter E.'s) employer.[5] United is the claims administrator for the Plan and is granted discretionary authority under the Plan to construe and interpret its terms.[6]

On December 10, 2014, Eric was admitted into Vista Adolescent Treatment Center (Vista), a licensed residential treatment center, to be treated for substance abuse and mental health issues.[7] Eric had received various kinds of treatment over the previous several years—including one month of residential treatment at the Camp Recovery Center and nearly two months of wilderness therapy at the Aspiro Wilderness Adventure Therapy Treatment Center immediately prior to his admission into Vista—but had made little, if any, progress.[8] According to United's records, Eric was admitted to Vista because of his persistent failures and inability to function in lower levels of care, home and social environment issues, lack of symptom self-management and adequate relapse prevention strategies, general interpersonal problems, and need to engage in mental-health recovery.[9] Eric remained at Vista until August 13, 2015.[10]

---

[5] ECF Nos. 107 at 5–6; 108 at 2. The Plan in effect at the time United denied Plaintiffs' coverage is found at AR 222–436. "AR" refers to the Administrative Record that is filed under seal at ECF Nos. 114–114-9. The court will cite contents in the administrative record by their Bates number.

[6] AR 261, 397, 409, 1020, 1053, 3212, 3225. Defendant United Healthcare Services is the named third-party claims administrator for the Plan. *Id.* at 261, 3212. Defendant United Behavioral Health is a sister company through which United Healthcare Services administers claims related to mental health and substance use disorders. *Id.* at 3225.

[7] *Id.* at 752–54.

[8] *Id.* at 704–54.

[9] *Id.* at 753–57.

[10] *Id.* at 1605.

United initially approved coverage for Eric's treatment at Vista from December 10–15, 2014, and extended coverage four more times until January 14, 2015.[11] However, during Eric's next coverage review, a licensed clinical social worker for United, Sheryl Stanley, concluded that Eric's conditions had improved to the point that residential treatment at Vista was no longer necessary.[12] Although Eric's primary therapist at Vista, Jason Seavey, had reported that Eric still needed to demonstrate an ability to choose appropriate peer groups, use healthy coping strategies instead of turning to drugs and alcohol, and reduce his anxiety before leaving residential care, Ms. Stanley believed these goals could be achieved at a lower level of care.[13]

Eric's file was submitted for a peer review by Dr. Thomas Blocher, an associate medical director for United, who agreed that Eric no longer met the criteria for residential treatment under United's Coverage Determination Guideline (CDG) for "Substance Use Disorders."[14] In an adverse benefit determination notice dated January 22, 2015, Dr. Blocher explained that Eric could continue to progress in a lower level of care because he was willingly participating in and benefiting from treatment; had cravings but was working on strategies to control them; was not a danger to himself or others; had supportive parents and a sober home; was not in imminent risk of relapse; and did not have withdrawal symptoms, acute medical comorbidities, or behavioral issues that required 24-hour monitoring and treatment.[15] Based on Dr. Blocher's findings, United denied coverage for Eric's treatment at Vista from January 15, 2015, forward.[16]

---

[11] *Id.* at 752–99.

[12] *Id.* at 800–07. As will be discussed in more detail below, Ms. Stanley first suggested that Eric no longer met admission criteria for residential treatment on December 29, 2014, but coverage was extended after a peer review. *Id.* at 781–84.

[13] *Id.* at 806–07.

[14] *Id.* at 807–10, 1053–55.

[15] *Id.* at 809.

[16] *Id.* at 1053–55.

United's Behavioral Health Plan Level of Care Guidelines (LCG) at the time in question defined a "Residential Treatment Center" for mental and behavioral health conditions as "[a] sub-acute facility-based program which provides 24-hour/7-day assessment and diagnostic services, and active behavioral health treatment services to members who do not require the intensity of nursing care, medical monitoring, and physician availability" present in more intensive levels of care.[17] For treatment at a residential treatment center to be covered under the Plan, the member had to meet, among other things, the following general criteria:

1. Admission Criteria

. . . .

1.4. The member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission).

1.4.1. Failure of treatment in a less intensive level of care is <u>not</u> a prerequisite for authorizing coverage.

<u>AND</u>

1.5. The member's current condition can be safely, efficiently, and effectively assessed and/or treated in the proposed level of care. Assessment and/or treatment of acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission) require the intensity of services provided in the proposed level of care.

<u>AND</u>

1.6. Co-occurring behavioral health and medical conditions can be safely managed.

<u>AND</u>

1.7. Services are:

1.7.1. Consistent with generally accepted standards of clinical practice;

1.7.2. Consistent with services backed by credible research soundly demonstrating that the services will have a measurable and beneficial health outcome, and are therefore not considered experimental;

---

[17] *Id.* at 620, 630.

4

1.7.3. Consistent with Optum's best practice guidelines;

1.7.4. Clinically appropriate for the member's behavioral health conditions based on generally accepted standards of clinical practice and benchmarks.

<u>AND</u>

1.8. There is a reasonable expectation that services will improve the member's presenting problems within a reasonable period of time.

1.8.1. Improvement of the member's condition is indicated by the reduction or control of the acute signs and symptoms that necessitated treatment in a level of care.

1.8.2. Improvement in this context is measured by weighing the effectiveness of treatment against evidence that the member's signs and symptoms will deteriorate if treatment in the current level of care ends. Improvement must also be understood within the broader framework of the member's recovery, resiliency and wellbeing.

<u>AND</u>

1.9. Treatment is not primarily for the purpose of providing social, custodial, recreational, or respite care.

. . . .

<u>AND</u>

1.2. The member is not in imminent or current risk of harm to self, others, and/or property.

<u>AND</u>

1.3. The "why now" factors leading to admission cannot be safely, efficiently, or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors. Examples include:

1.3.1. Acute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered.

1.3.2. Psychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care.[18]

---

[18] *Id.* at 613–14, 620.

For coverage of residential treatment services to continue under the Plan, the member's treatment must focus on addressing the "why now" factors and all admission criteria must continue to be met.[19]

United's CDGs for "Substance-Related and Addictive Disorders" and "Substance Use Disorders" during the relevant period were largely the same but included a few additional criteria.[20] Admission to a residential rehabilitation program under those CDGs required that:

1.2. There is no risk of withdrawal, or signs and symptoms of withdrawal can be safely managed.

AND

1.3. The "why now" factors leading to admission and/or the member's history of response to treatment suggest that there is imminent or current risk of relapse which cannot be safely, efficiently, and effectively managed in a less intensive level of care. Examples include:

1.3.1. A co-occurring mental health condition is stabilizing but the remaining signs and symptoms are likely to undermine treatment in a less intensive setting.

1.3.2. The member is in immediate or imminent danger of relapse, and the history of treatment suggests that the structure and support provided in this level of care is needed to control the recurrence.

AND

1.4. The "why now" factors leading to admission cannot be safely, efficiently, or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms, and/or psychological and environmental factors. Examples include:

1.4.1. Acute impairment of behavior or cognition is interfering with Activities of Daily Living to the extent that the welfare of the member or others is endangered.

1.4.2. Psychosocial and environmental problems threaten the member's safety, or undermine engagement in a less intensive level of care.[21]

---

[19] *Id.* at 620, 624.

[20] *See id.* at 437–71, 475–505, 673–703.

[21] *Id.* at 467, 495–96; 693–94. The provisions quoted above come from United's CDG for "Treatment of Substance-Related & Addictive Disorders" as revised in November 2015. *See id.* at 437–74. The court quotes from that CDG only because of its clearer organization. The parties have not argued, nor has the court found, any substantive difference in the criteria for residential treatment found in the November 2015 Substance-Related and Addictive Disorders CDG and its 2014 version or the 2014 Substance Use Disorders CDG.

As with United's LCG for residential treatment generally, continued coverage of residential treatment under United's substance-abuse CDGs required that all admission criteria continue to be met.[22]

On July 20, 2015, Plaintiffs filed a first-level appeal to challenge United's denial of coverage after January 14, 2015.[23] Plaintiffs argued that Dr. Blocher failed to consider Eric's diagnoses of major depressive disorder and ADHD when determining whether Eric required residential treatment.[24] They argued that Dr. Blocher's considering the criteria under the Substance Use Disorder CDG alone was improper.[25] Plaintiffs submitted several exhibits in support of their appeal, including an email from Dr. Mark Falls of the Camp Recovery Center, a letter from Case Manager Walter Lile of the Camp Recovery Center, part of a psychological assessment report for Eric by Dr. Todd Correlli, and Eric's medical records from Vista.[26]

Plaintiffs' first-level appeal was reviewed by Dr. Kathy Scott-Gurnell, another associate medical director for United.[27] After considering the appeal record[28] and concluding that Eric still met the Substance Use Disorders CDG criteria for residential treatment from January 15–31, 2015, Dr. Scott-Gurnell partially reversed Dr. Blocher's denial.[29] She explained that Eric required residential treatment until January 31, 2015, because 24-hour monitoring was needed to

---

[22] *Id.* at 498, 696.

[23] *Id.* at 1029–48.

[24] *Id.* at 1030–34.

[25] *Id.*

[26] *Id.* at 1122, 1124–25, 1127–30, 1131–487.

[27] *Id.* at 816–17, 1645.

[28] As will be discussed below, the parties dispute whether, or to what extent, Dr. Scott-Gurnell considered all the medical records Plaintiffs submitted as part of their first-level appeal. ECF No. 128 at 3.

[29] AR 816–17, 1643–44. Because Dr. Blocher's denial was found to be incorrect and was reversed in part by Dr. Scott-Gurnell, the court will only evaluate whether Dr. Scott-Gurnell's and subsequent reviewers' coverage determinations were proper under ERISA.

help resolve his irritable mood, sadness, and using dreams.[30] However, Dr. Scott-Gurnell upheld Dr. Blocher's denial for the rest of Eric's treatment at Vista, finding that Eric's improved mood and anger control, family support and safe home environment, and lack of withdrawal symptoms showed that he did not require 24-hour monitoring after January 31, 2015.[31]

Plaintiffs initiated a second-level appeal on October 7, 2015.[32] They argued that Dr. Scott-Gurnell failed to adequately consider Eric's mental health diagnoses in deciding medical necessity and ignored letters from Eric's previous treating physicians.[33] They also argued that Eric had still not made sufficient improvement by January 31, 2015, to be discharged to a lower level of care.[34]

The second-level appeal was reviewed by Dr. Sheryl Jones, another associate medical director for United.[35] Dr. Jones agreed with Dr. Scott-Gurnell that coverage could not be extended past January 31, 2015.[36] Dr. Jones considered the CDGs for "Depressive Disorders," "Substance-Related and Addictive Disorders," "Attention Deficit/Hyperactivity Disorder," and "Generalized Anxiety Disorders" in reaching her conclusion.[37]

Although Dr. Jones's review constituted United's final internal administrative remedy, Plaintiffs exercised their right under the Plan to have a coverage review conducted by an external Independent Review Organization (IRO) on April 20, 2016.[38] The external review was

---

[30] *Id.*

[31] *Id.* at 1644.

[32] *Id.* at 1603.

[33] *Id.* at 1605–06.

[34] *Id.*

[35] *Id.* at 820–21, 1663–64.

[36] *Id.*

[37] *Id.*

[38] *Id.* at 1671–72.

conducted by an anonymous physician who was board certified in general psychiatry and addiction psychiatry.[39] After considering the same CDGs considered by Dr. Jones, the external reviewer upheld United's coverage denial.[40] The external reviewer concluded that Eric's "why now" factors were treatable in a less restrictive level of care because Eric was not psychiatrically decompensated to the extent that he posed a danger to himself or others, he had "no comorbid medical instability" that required 24-hour care, and he had a supportive and safe home environment.[41] Under the terms of the Plan the decision by the IRO was "binding,"[42] but the parties disagree as to what effect that term has here, if any.[43]

Plaintiffs initiated this action on May 19, 2017.[44] Plaintiffs bring their ERISA claim to recover benefits under 29 U.S.C. § 1132(a)(1)(B) and their Parity Act violation claim under 29 U.S.C. § 1132(a)(3).[45]

## DISCUSSION

Plaintiffs and Defendants have both moved for summary judgment. Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[46] A material fact is one that "might affect the outcome of the suit under the governing law."[47] A dispute regarding a material fact is

---

[39] *Id.* at 2901–03.

[40] *Id.* at 2906–07

[41] *Id.* at 2906.

[42] *Id.* at 418.

[43] *Compare* ECF No. 107 at 35–35, *with* ECF No. 108 at 14–16.

[44] ECF No. 2. Plaintiffs filed an amended complaint on November 21, 2018, and a second amended complaint on August 9, 2019. ECF Nos. 45, 55.

[45] ECF No. 55.

[46] Fed. R. Civ. P. 56(a).

[47] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

genuine for purposes of summary judgment only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[48] Generally, when determining whether a genuine dispute exists, the evidence "must be viewed in the light most favorable to the party opposing" a motion for summary judgment.[49]

When both parties move for summary judgment in an ERISA case, however, they essentially "stipulate that a trial is unnecessary," and summary judgment becomes "a vehicle for deciding the case." [50] The cross-motions must be "decided solely on the administrative record," and neither party is "entitled to the usual inferences in its favor."[51] The court will begin with Plaintiffs' ERISA claim.

## I.    Plaintiffs are Entitled to Summary Judgment on their ERISA Claim.

Under ERISA, individuals may bring a civil action to recover benefits due to them under a covered plan.[52] Before seeking judicial review of a coverage determination, plan participants and beneficiaries generally must exhaust all administrative remedies available to them under the terms of their plan.[53] There is no dispute here that Plaintiffs participated in a plan that is covered by ERISA or that they exhausted their administrative remedies before bringing this suit. The sole issue here is whether United's denial of coverage for Eric's treatment at Vista from February 1, 2015, forward violated ERISA.

---

[48] *Id.*

[49] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[50] *Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1167 (D. Utah 2019) (quoting *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010)).

[51] *Id.*

[52] 29 U.S.C. § 1132(a)(1)(B).

[53] *See Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 105 (2013); *Holmes v. Colorado Coal. for Homeless Long Term Disability Plan*, 762 F.3d 1195, 1204 (10th Cir. 2014).

### A.  The Court Must Review United's Benefits Determination under an Arbitrary and Capricious Standard of Review.

Before the court can determine whether United's denial of benefits was proper, the court must determine which standard of review to apply. The United States Supreme Court has observed that "the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue."[54] Applying the law of trusts, the Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[55] "[I]f the plan gives the administrator discretionary authority, '[courts] employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious.'"[56] Under this deferential standard of review, the court "determin[es] whether the interpretation of the plan was reasonable and made in good faith."[57]

Here, the parties do not dispute that the Plan confers discretionary authority on United to interpret the Plan and make benefits decisions.[58] Because Plaintiffs challenge United's coverage determination regarding Eric's treatment at Vista, the arbitrary and capricious standard is the presumptive standard of review.[59]

Plaintiffs argue, however, that United forfeited this deferential standard of review because it did not comply with ERISA's procedural requirements for denying benefits when it failed to

---

[54] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[55] *Id.*

[56] *Hodges v. Life Ins. Co. of N. Am.*, 920 F.3d 669, 675 (10th Cir. 2019) (quoting *LaAsmar*, 605 F.3d 789 at 796).

[57] *Id.*

[58] *See* AR 191, 409; *see also* ECF Nos. 107 at 6; 128 at 2–6.

[59] ECF No. 108 at 24–27.

(1) consider the opinions of all the medical professionals who had treated Eric, (2) describe what additional material or information was necessary to perfect Eric's claim for continued treatment at Vista, and (3) consider Eric's specific medical circumstances rather than broad generalizations about his condition.[60] Asking the court to follow the Second Circuit's approach in *Halo v. Yale Health Plan, Director of Benefits & Records Yale University*,[61] Plaintiffs contend that all but de minimis, harmless, and inadvertent violations of ERISA's procedural requirements require the court to review a denial of benefits de novo.[62]

United counters by arguing that it did not forfeit the arbitrary and capricious standard of review because it fully complied with ERISA's procedural requirements in denying Plaintiffs' claim.[63] However, even if there were some irregularities with its procedures or process, United argues, the law in the Tenth Circuit has long been that a defendant forfeits its right to deferential review only when it has failed to substantially comply with ERISA's requirements.[64]

Under ERISA, when a participant's claim for benefits is denied, the plan must "provide adequate notice in writing" that "set[s] forth the specific reasons for [the] denial."[65] The notice must include, in pertinent part,

(1) The specific reason or reasons for the adverse determination;

(2) Reference to the specific plan provisions on which the benefit determination is based;

(3) A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits

---

[60] *Id.* at 22–23.

[61] *Halo v. Yale Health Plan*, *Dir. Of Benefits & Recs. Yale Univ.*, 819 F.3d 42, 56 (2nd Cir. 2016).

[62] ECF No. 108 at 18–22.

[63] ECF No. 127 at 23–25.

[64] *Id.* at 23–25.

[65] 29 U.S.C. § 1133(1). This section is the codified Section 503 of ERISA. The relevant implementing regulations are codified at 29 C.F.R. § 2560.503-1.

(4) A statement describing any voluntary appeal procedures offered by the plan; and

(5) References to specific guidelines and protocols used in making the adverse determination and, if the adverse determination is based on a medical necessity determination, an explanation of the scientific or clinical judgment for that determination.[66]

The plan must also "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."[67] To ensure this full and fair review process occurs, the Department of Labor (DOL) has developed certain procedural requirements through regulations.[68] A plan's claim procedures must "contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants."[69] And if the plan fails to meet the DOL's requirements, claimants may seek judicial review of a denial of benefits without having to first exhaust their administrative remedies.[70] The DOL has emphasized that these requirements "are essential to procedural fairness and that a decision made in the absence of the mandated procedural protections *should not be entitled to any judicial deference*."[71]

---

[66] 29 C.F.R. § 2560.503-1(j)

[67] 29 U.S.C. § 1133(2).

[68] *See generally* 29 C.F.R. § 2560.503-1 (implementing ERISA Section 503); *see also id.* § 2590.715-2719(b) (implementing "[o]ther consumer protection provisions, including other protections provided by the Affordable Care Act and the Mental Health Parity and Addiction Equity Act" as stated in 29 C.F.R. § 2590.701-1(b)).

[69] 29 C.F.R. § 2560.503-1(b)(5).

[70] *Id.* § 2560.503-1(*l*). In a similar regulation under the Patient Protection and Affordable Care Act, the Department of Labor has more specifically stated that where a plan fails to provide required procedural protections, the participant's "claim or appeal is deemed denied on review without the exercise of discretion by an appropriate fiduciary." *Id.* § 2590.715-2719(b)(2)(ii)(F)(1).

[71] EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974; RULES AND REGULATIONS FOR ADMINISTRATION AND ENFORCEMENT; CLAIMS PROCEDURE, 65 FR 70246-01 at 70255 (emphasis added).

In determining whether United's initial denial of coverage and the subsequent reviews thereof satisfied the DOL's regulations, Plaintiffs ask the court to utilize the approach in *Halo*.[72] In that case the Second Circuit found that under the DOL's regulations "a plan administrator's failure to comply with the letter of the claims procedures outlined in ERISA requires courts to eschew the more deferential arbitrary and capricious review normally applied to an administrator's discretionary decisions in favor of a more searching de novo review."[73]

However, the court declines to follow *Halo*. The DOL's regulations permit a civil action absent administrative exhaustion when a plan fails to use a reasonable claims procedure, but they say nothing about the judicial standard of review for that subsequent proceeding.[74] They only authorize a "route to judicial review" that administrative exhaustion requirements would otherwise preclude.[75]

Nevertheless, the Tenth Circuit has recognized that the standard of review can be heightened to de novo review despite a plan administrator's discretionary authority under certain circumstances. When determining whether violations of ERISA's procedural requirements warrant de novo review, the Tenth Circuit has traditionally applied a "substantial compliance rule,"[76] meaning that "in the context of an ongoing, good faith exchange of information between the administrator and the claimant, inconsequential violations of the deadlines or other procedural irregularities would not entitle the claimant to de novo review."[77] While the Tenth

---

[72] *See Halo*, 819 F.3d at 47.

[73] *Id.* at 47 (citation and internal quotation marks omitted).

[74] 29 C.F.R. § 2560.503-1(*l*)(1).

[75] *Joel S. v. Cigna*, 356 F. Supp. 3d 1305, 1312 (D. Utah 2018)*, appeal dismissed* (Mar. 28, 2019).

[76] *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 827 (10th Cir. 2008)

[77] *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1317 (10th Cir. 2009) (citing *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 624, 634 (10th Cir. 2003)).

Circuit has questioned the continued viability of the substantial compliance rule in light of regulatory changes,[78] it remains precedent to not "apply 'a hair-trigger rule' requiring de novo review whenever the plan administrator, vested with discretion, failed *in any respect* to comply with the procedures mandated by this regulation."[79] In line with this principle, the Tenth Circuit has found that a heightened standard is appropriate when: the administrator fails to exercise discretion within the required timeframe or fails to apply its expertise to a particular decision;[80] the case involves "serious procedural irregularities"[81] or "procedural irregularities in the administrative review process";[82] or the plan members lack notice of the administrator's discretionary authority.[83] So, bound by this precedent, the court examines whether United substantially complied with ERISA's procedural requirements.

Plaintiffs first argue that United failed to substantially comply with ERISA's procedural requirements because it did not consider the opinions of all of Eric's treating medical professionals when determining whether he met the criteria for coverage.[84] Plaintiffs contend that United's reviewers "cherry-pick[ed]" the evidence from the record that supported their

---

[78] *Kellogg*, 549 F.3d at 828 ("In January 2002, amendments to the regulations took effect that have called into question the continuing validity of the substantial compliance rule."); *see also Halo*, 819 F.3d at 56 ("Whatever the merits of applying the substantial compliance doctrine under the 1977 claims-procedure regulation, we conclude that the doctrine is flatly inconsistent with the 2000 regulation."). In its 2000 implementation, the Department of Labor explicitly rejected the suggestions that it implement a "standard of good faith compliance as the measure for requiring administrative exhaustion," and it rejected the suggestion that it "recognize the judicial doctrine under which exhaustion is required unless the administrative processes impose actual harm on the claimant." EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974; RULES AND REGULATIONS FOR ADMINISTRATION AND ENFORCEMENT; CLAIMS PROCEDURE, 65 FR 70246-01 at 70255–56.

[79] *LaAsmar*, 605 F.3d at 799.

[80] *Gilbertson*, 328 F.3d at 631–32.

[81] *Martinez v. Plumbers & Pipefitters Nat. Pension Plan*, 795 F.3d 1211, 1215 (10th Cir. 2015).

[82] *LaAsmar*, 605 F.3d at 797; *Mary D. v. Anthem Blue Cross Blue Shield*, 778 F. App'x 580, 588 (10th Cir. 2019) (unpublished).

[83] *Lyn M. v. Premera Blue Cross*, 966 F.3d 1061, 1065 (10th Cir. 2020).

[84] ECF No. 108 at 22, 24–26.

conclusions and ignored the opinions of Eric's prior medical care providers they had submitted with their appeal letter.[85]

However, Plaintiffs have failed to point to any evidence in the record showing that United's reviewers failed to consider all the materials Plaintiffs submitted during the appeals process. According to her case notes and first-level review letter, Dr. Scott-Gurnell considered all of United's case notes for Eric, Plaintiffs' appeal letter, and Eric's medical records when reviewing Dr. Blocher's initial coverage determination.[86] Plaintiffs have provided no basis for their assertion that Dr. Scott-Gurnell ignored the opinions of Eric's prior medical care providers, especially considering that Plaintiffs quoted the most relevant portions of those opinions in their appeal letter itself.[87] Nor have Plaintiffs cited any authority that required United's reviewers to provide a direct response to each medical opinion Plaintiffs provided.[88] Thus, there is no basis to conclude that she failed to take any of the materials Plaintiffs submitted into account when determining whether Eric's treatment at Vista was covered. The same is true for Dr. Jones and the external reviewer.[89]

Plaintiffs next argue that United failed to substantially comply with ERISA's procedural requirements because it made no attempt to describe what materials or information were

---

[85] *Id.*

[86] AR  816, 1644.

[87] *Id.* at 1036–41.

[88] *See Mary D.*, 778 F. App'x at 589 ("[A]lthough M.D. asserts that she requested responses to the materials and arguments she submitted, she doesn't cite any authority—nor are we aware of any—that required Anthem and the Benefits Committee to affirmatively *respond* to these specific submissions. Instead, [the regulations] merely required Anthem and the Benefits committee to 'take[]' these materials and arguments 'into account.'" (second alteration in original) (quoting 29 C.F.R. § 2560.503-1(h)(2)(iv))).

[89] Dr. Jones and the external reviewer reported that they reviewed United's case notes, Plaintiffs' appeal letters, Plaintiffs' appeal materials, and Eric's medical records. AR 820, 1663, 2902–03. There appears to be only one exhibit—a letter purportedly from Mr. Seavey dated September 29, 2015—that Plaintiffs provided for the second-level appeal and external review that they did not provide to Dr. Scott-Gurnell. *See id.* at 1607. There is no evidence that either Dr. Jones or the external reviewer failed to take that additional letter into consideration with all other materials submitted by Plaintiffs.

necessary to perfect Eric's claims in its initial denial letter.[90] However, Plaintiffs have failed to make any argument as to how United failed to satisfy the DOL's regulations on these grounds. This was not a case in which United denied coverage due to a lack of available information, but because its reviewers concluded based on all available evidence that Eric did not meet the criteria for residential treatment.[91] The regulations require notification of materials or information necessary to perfect a claim only if there is "any."[92] Plaintiffs have failed to point to any materials or information that could have been considered when evaluating their claims that were not considered. They simply disagree with the reviewers' application of United's CDGs and their conclusions.

Plaintiffs' last argument regarding compliance with the DOL's regulations is that United's reviewers based their coverage determinations on conclusory generalizations about Eric's medical condition rather than analyzing Eric's specific circumstances under the terms of the Plan.[93] However, Plaintiffs have failed to show that the reviewers did not comply with the regulation. The regulations require only that a reviewer "[r]eference . . . the specific plan provisions on which the benefit determination is based" and provide "the specific reason or reasons" for denying coverage.[94] Dr. Scott-Gurnell, Dr. Jones, and the external reviewer each identified the CDGs they used to determine whether Eric's treatment at Vista was covered.[95] And

---

[90] ECF No. 108 at 23.

[91] *See Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 804 (10th Cir. 2004) ("[N]othing in ERISA requires plan administrators to go fishing for evidence favorable to a claim when it has not been brought to their attention that such evidence exists."); *Jo H. v. Cigna Behav. Health*, No. 2:17-CV-00110-TC, 2018 WL 4082275, at *8 (D. Utah Aug. 27, 2018) (finding that ERISA did not require a claims administrator to request records that did not yet exist in order to satisfy the DOL's requirement that administrators inform claimants of any materials or information necessary to perfect their claims).

[92] *See* 29 C.F.R. § 2560.503-1(g)(1)(iii).

[93] ECF No. 108 at 23.

[94] 29 C.F.R. § 2560.503-1(j)(2).

[95] *See* AR 816, 820–21, 1643–45, 1663–64, 2902.

all of their letters state the clinical judgment that Eric did not require 24-hour monitoring and provide the specific reasons they reached that conclusion.[96] While it remains to be analyzed whether the reviewers' explanations were proper and determinations correct, Plaintiffs have failed to show that any error in the process of making those determinations was so substantial that the court should set aside the deferential standard accorded to plan administrators who are explicitly granted discretionary authority under an ERISA plan. Therefore, the court will review United's denial of benefits under the arbitrary and capricious standard of review.

### B. Defendants' Denial of Coverage Was Arbitrary and Capricious.

"Under arbitrary and capricious review, this court upholds [the administrator's] determination so long as it was made on a reasoned basis and supported by substantial evidence."[97] The Tenth Circuit defines substantial evidence as "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision-maker. Substantial evidence requires more than a scintilla but less than a preponderance."[98]

In arguing that United's adverse benefits determination was arbitrary and capricious, Plaintiffs essentially echo the arguments they made with regard to whether United's reviewers substantially complied with the DOL's regulations. First, they argue that United disregarded the opinions of medical professionals who treated Eric before he was admitted to Vista and those who continued treating him after coverage was denied.[99] Second, they argue that United failed to use the proper CDG criteria when evaluating Eric's medical conditions.[100]

---

[96] *Id.* at 1643–45, 1663–64, 2906.

[97] *Van Steen v. Life Ins. Co. of N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018).

[98] *Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009) (quoting *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992)).

[99] ECF No. 108 at 25–26.

[100] *Id.* at 26–27.

Defendants argue that their coverage determination was not arbitrary and capricious because there is substantial evidence supporting it.[101] They contend that each reviewer evaluated all available medical evidence and concluded that residential treatment was not covered after January 31, 2015, under one or more of United's CDGs.[102]

As discussed above, Plaintiffs have not shown that United's reviewers failed to consider any of the materials Plaintiffs provided on appeal. And although Eric's previous medical care providers opined that residential treatment was medically necessary, Plaintiffs have failed to show why those opinions should have been controlling when none of those medical care providers treated Eric during the date range for which coverage is in question.[103] Such opinions were relevant to some of the criteria for residential treatment in United's CDGs related to substance abuse,[104] but that does not mean they were entitled to deference over more current medical records or that they provided conclusive evidence that Eric met *all* criteria for residential

---

[101] ECF No. 107 at 30–35.

[102] *Id.*; ECF No. 127 at 34–35. Defendants also argue that the parties are "bound" by the outcome of Plaintiffs' voluntary external appeal, which upheld United's denial of benefits, with regard to Plaintiffs' ERISA claim because the Plan states that such outcomes are "binding." *See* ECF No. 107 at 35–36. However, it is unclear from Defendants' arguments exactly how they believe that provision affects these cross motions for summary judgment. Defendants contend that "binding" in this context means "requiring obedience." ECF No. 135 at 16. In some instances, Defendants appear to argue that they are entitled to summary judgment on Plaintiffs' ERISA claim because the "binding" provision means that the parties "may not challenge [the external reviewer's] determination in any context." *Id.*; ECF No. 107 at 35–36. In others, however, Defendants state that they "have never argued that the external reviewer's determination is outcome determinative," only that the "external reviewer's report is a piece of substantial evidence in the record that supports" their denial of coverage. ECF No. 135 at 8. Because Defendants have not sufficiently argued how the result of Plaintiffs' external review binds the parties and why that entitles them to summary judgment on Plaintiffs' ERISA claim, the court will not address what effect such a provision has upon Plaintiffs' right to bring an ERISA action other than to note that Defendants have cited no cases, controlling or otherwise, that have found that a Plan provision may preclude an insured or beneficiary from filing an ERISA claim.

[103] AR 1122, 1124–25, 1127–30. Dr. Correlli's psychological assessment report indicates that he evaluated Eric on October 21, 2014, approximately two months before Eric's admission to Vista. *Id.* at 1127. Mr. Lile, who was Eric's case manager at The Camp Recovery Center, last treated Eric on September 26, 2014, approximately two and a half months before his admission to Vista. *Id.* at 1125. Dr. Falls email indicates that he first evaluated Eric on November 21, 2013, and Plaintiffs' appeal letters indicate that Dr. Fall last treated in July or August 2014, over three months before Eric's admission to Vista. *Id.* at 1122, 1037–38.

[104] For instance, such information was relevant to determining whether Eric's "history of response to treatment suggest[s] that there is imminent or current risk of relapse which cannot be safely, efficiently and effectively managed in a less intensive level of care. *See id.* at 495, 693–94.

19

treatment at the time in question. That the reviewers may have given greater weight to Eric's contemporary medical records than to opinions from previous medical care providers in determining whether the admission criteria were met was not arbitrary and capricious.

Plaintiffs' September 29, 2015 letter from Vista that was first provided with their second-level appeal level does not change this outcome.[105] Although the letter is purportedly from Mr. Seavey, it is not signed and repeatedly refers to Mr. Seavey in the third person.[106] Additionally, the letter lacks specific dates for its treatment notes and suggestions; it also discusses Eric's treatment as if it were ongoing even though Eric was discharged from Vista in August 2015.[107] Thus, there is no basis for finding that the reviewers' disagreement with the September 29, 2015 letter's recommendation, on its own, renders their denials arbitrary and capricious.

However, that the reviewers appear to have considered all of Eric's medical records does not necessarily mean that the explanations they provided when denying coverage show a proper application of United's CDGs or that their conclusions are supported by substantial evidence. Plaintiffs argue that the explanations provided in the reviewers' denial letters are conclusory and do not adequately show that Eric failed to meet the criteria for residential treatment.[108] Plaintiffs place particular emphasis on the absence of citations to Eric's medical records or specific plan language in the reviewers' letters.[109] Although the reviewers were not required to cite to specific medical records or copy verbatim plan language in their denial letters,[110] the court must be able to determine from the record what plan criteria Eric failed to meet and whether there is

---

[105] *See id.* at 1607, 2867–70.

[106] *Id.* at 2870.

[107] *Id.* at 2867–70.

[108] ECF No. 108 at 26–27.

[109] *Id.*

[110] *See Mary D.*, 778 F. App'x at 589.

substantial evidence that he failed to do so. Having reviewed the record, the court finds that the coverage determinations made by United's reviewers and the external reviewer were inadequate on these grounds.

As noted above, the main requirement for continued care in a residential treatment center under United's CDGs was for Eric to continue meeting the admission criteria for that level of care.[111] The admission criteria for residential treatment centers under United's behavioral health plan was based primarily on the presence of "why now" factors, "acute changes in the member's signs and symptoms and/or psychosocial and environmental factors" that show why "the member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care."[112] According to United's records, the main reasons for Eric's admission to Vista (his "why now" factors) were:

- his recent and repeated failure to stop drug use after treatment in lower levels of care;

- his ongoing substance abuse and lack of engagement in mental health recovery;

- general interpersonal problems;

- concerns about his home environment, particularly his mother's alcohol abuse; and

- his failure to self-manage his symptoms and apply adequate relapse prevention strategies.[113]

Although substance abuse was listed as Eric's "primary driver for admission," United approved coverage under the "Depressive Disorders" CDG which, in addition to common level of care criteria, required proof that:

---

[111] *See supra* notes 19, 22 and accompanying text.

[112] AR 613.

[113] *Id.* at 753–57.

- The member is experiencing a disturbance in mood, affect or cognition resulting in behavior that cannot be safely managed in a less restrictive setting.

  - OR -

- There is an imminent risk that severe, multiple and/or complex psychosocial stressors will produce significant enough distress or impairment in psychological, social, occupational/educational, or other important areas of functioning to undermine treatment in a lower level of care.

  - OR -

- The member has a co-occuring medical disorder or substance use disorder which complicates treatment of the presenting mental health condition to the extent that treatment in a Residential Treatment Center is necessary.

  - AND -

- The member is not at imminent risk of serious harm to self or others.[114]

United extended coverage under the Depressive Disorders CDG two more times—each time noting that discharge from residential treatment was inappropriate because Eric's symptoms were not manageable in a less restrictive setting and his relapse prevention strategies were inadequate[115]—until December 29, 2014, when Ms. Stanley first suggested that Eric no longer met the criteria for residential treatment and referred his case for peer review.[116] Ms. Stanley suggested that the "[o]nly criteria for 24 hour care appears to be home environment," particularly Eric's mother's "drinking pattern."[117] Dr. Blocher disagreed with Ms. Stanley on peer review and approved coverage based on United's Substance Use Disorder CDG because Eric was still emotionally unstable, had a high risk of relapse, had family members dealing with substance

---

[114] *Id.* at 757, 2955. Although neither the record nor the parties clarify which "depressive disorders" CDG United used when initially approving coverage for Eric's treatment at Vista, the court presumes it was the CDG for "Treatment of Depressive Disorders: Major Depressive Disorder, Persistent Depressive Disorder & Premenstrual Dysphoric Disorder (PMDD)" that was in effect during December 2014. *See id.* at 2937–62. Even if that was not the original CDG United used, the other relevant depressive disorder CDG in effect at that time had the same requirements. *See id.* at 3150, 3166.

[115] *Id.* at 762–63, 767–69, 773–75.

[116] *Id.* at 779–81.

[117] *Id.* at 781.

abuse issues, had failed multiple times at lower levels of care, and his mental illness was not yet clearly understood.[118]

After Dr. Blocher's peer review extended coverage until January 5, 2015,[119] United approved treatment at Vista under the Depressive Disorders CDG two more times, noting that Eric could not be treated in a less restrictive level of care because his mental health conditions and his mother's alcohol use at home compromised his ability to prevent relapse.[120] However, on January 14, 2015, Ms. Stanley again suggested that Eric no longer met the criteria for residential treatment under the Depressive Disorders CDG, and Dr. Blocher agreed after evaluating the available records under the Substance Use Disorders CDG.[121]

On Plaintiffs' first-level appeal, Dr. Scott-Gurnell overturned Dr. Blocher's denial[122] from January 15–31, 2015, but upheld it after that date, based on United's Substance Use Disorders CDG.[123] She stated Eric did not need 24-hour monitoring and care to maintain sobriety and mental health after January 31 because his mood was more stable, he had family support and a safe home, and he was not experiencing withdrawal symptoms.[124]

However, this explanation does not adequately show the court that Dr. Scott-Gurnell evaluated the proper criteria in finding that Eric's treatment at Vista did not qualify for coverage after January 31, 2015, based on the Substance Use Disorders CDG. Under that CDG, admission

---

[118] *Id.* at 783–84.

[119] *Id.* at 784.

[120] *Id.* at 788–89, 791–92, 796–97, 799.

[121] *Id.* at 806–09. Neither the parties nor the record explains why Dr. Blocher used the Substance Use Disorders CDG instead of the Depressive Disorders CDG for both peer reviews or why Ms. Stanley reverted back to using the Depressive Disorders CDG after Dr. Blocher's first peer review.

[122] As noted previously, because Dr. Blocher's denial was partially reversed by the first-level appeal and generally supplanted by it, the underlying denial is not discussed further.

[123] *Id.* at 816–17, 1643–45.

[124] *Id.* at 1644.

to a residential treatment center was covered if (1) Eric's "why now" factors could not be effectively "treated in a less intensive setting due to acute changes in [his] signs and symptoms and/or psychosocial and environmental factors" and (2) his "why now" factors or history of treatment "suggest that there is imminent or current risk of relapse which cannot be safely, efficiently and effectively managed in a less intensive level or care."[125] The existence of withdrawal symptoms was not a criterion for residential treatment.[126] And while Eric's improving mood and engagement in mental health treatment certainly showed improvement in some of Eric's "why now" factors—such as his lack of engagement in mental health recovery, interpersonal problems, and inability to self-manage symptoms related to his mental and behavioral health—Dr. Scott-Gurnell did not adequately explain why Eric's substance abuse-related "why now" factors no longer showed a need for residential treatment. For example, Dr. Scott-Gurnell did not explain how Eric's relapse prevention skills had improved to the point that he no longer faced an "imminent or current risk of relapse," or that such risks could be effectively treated in a less intensive level of care, notwithstanding his history of failures in lower levels of care and his mother's struggles with alcohol.[127]

The lack of explanation regarding these "why now" factors is especially relevant considering that the record shows Eric continued to report struggling with urges to use drugs and using dreams after January 31, 2015.[128] The presence of such symptoms was one of the main reasons Dr. Scott-Gurnell overturned Dr. Blocher's denial of coverage for January 15–31,

---

[125] *Id.* at 693–94.

[126] Admission to residential rehabilitation under United's Substance Use Disorder CDG requires that "[t]here is no risk of withdrawal, or the signs and symptoms of withdrawal can be safely managed." *Id.* at 693. Thus, withdrawal symptoms need not be present for admission to a residential treatment center.

[127] *Id.* at 693–94; *see also id.* at 768, 783–84, 788–89, 793, 795–97, 801–02, 804.

[128] *Id.* at 1166, 1175, 1177, 1180, 1202, 1204, 1219.

2015.[129] Her failure to explain why the presence of those symptoms in the months after that period[130]—and the mental decompensation that often accompanied it[131]—no longer evinced a need for residential treatment makes it impossible to find that the denial was supported by substantial evidence.

Additionally, although Dr. Scott-Gurnell did state that residential treatment was not necessary after January 31, 2015, in part because Eric's home environment was sufficiently safe and supportive, her conclusion lacks adequate support. Eric expressed concerns regarding his ability to remain sober at home in a family psychotherapy session on February 3, 2015, after his mother had been intoxicated during a recent phone call with him.[132] His anxiety and sobriety concerns related to his mother's struggles with alcohol appear to have persisted at least until she began making progress in her own recovery a few weeks later.[133] While that "why now" factor was not sufficient grounds on its own for Eric to continue qualifying for residential treatment,[134] Dr. Scott-Gurnell's failure to adequately explain why it and Eric's other substance abuse-related "why now" factors no longer showed a need for residential treatment under the Substance Use Disorders CDG criteria leaves the court unable to find that Dr. Scott-Gurnell's coverage determination is supported by substantial evidence.

Dr. Jones's and the external reviewer's coverage denials are inadequate for the same reasons. Both evaluated Eric's records under the CDGs for depressive disorders, substance-

---

[129] *Id.* at 1643.

[130] The record suggests that Eric's usage dreams began to wane in May 2015. *See id.* at 1166.

[131] *See id.* at 1175, 1177–78, 1180.

[132] *Id.* at 1216.

[133] *See id.* at 1186.

[134] One of the requirements for admission to residential treatment under the Substance Use Disorders CDG is that "[t]reatment is not primarily for the purpose of providing social, custodial, recreational, or respite care." *See id.* at 3109.

related and addictive disorders, ADHD, and generalized anxiety disorder.[135] However, even though the primary reason for Eric's admission to Vista was his substance abuse issues,[136] both based their denials almost exclusively on improvements in Eric's behavior, mental health, and social interactions.[137] While these improvements addressed some of Eric's "why now" factors—such as his lack of engagement in mental health recovery, interpersonal problems, and inability to self-manage his mental and behavioral health symptoms—both Dr. Jones and the external reviewer provided little to no explanation as to how Eric's relapse prevention strategies and home environment had improved to an extent that he could be safely and effectively treated outside of residential care in light of his history of repeated failures in lower levels of care.[138]

Dr. Jones stated that Eric "had gained insight into [his] illness and had been exposed to basic recovery concepts and the sobriety model," had "family and community support," and "did not appear to have any symptoms that would have required 24 hour monitoring."[139] However, this explanation does not adequately show the court that Dr. Jones evaluated Eric's conditions and symptoms under the proper criteria for residential treatment.[140] Whether or not Eric had any symptoms that required 24-hour monitoring was not a criterion for admission to residential

---

[135] Id. at 1663–64, 2906. The criteria for admission to residential treatment under the Substance Related and Addictive Disorders CDG used by Dr. Jones and the external reviewer are identical to the criteria under the Substance Use Disorders CDG used by Dr. Scott-Gurnell. Compare id. at 495–96, with id. at 693–94.

[136] Id. at 753–54.

[137] See id. at 1663–64, 2906.

[138] Dr. Jones's and the external reviewer's failure to adequately address Eric's substance abuse-related "why now" factors raises questions about their application of the mental health condition CDGs they used, not just the substance abuse and addiction CDGs. The CDGs for depressive disorders, ADHD, and generalized anxiety disorder all allow admission to residential treatment when "[t]he member has a co-occurring . . . substance use disorder which complicates treatment of the presenting mental health condition to the extent that treatment in a Residential Treatment Center is necessary." See id. at 561, 2955, 3017. Although Eric's mental health and behavior improved at Vista, Dr. Jones and the external reviewer failed to adequately explain how his substance abuse-related "why now" factors had improved such that he no longer required residential treatment to maintain his progress or further it.

[139] Id. at 1664.

[140]

26

treatment under any of the CDGs Dr. Jones considered. And Dr. Jones's statements that Eric "had been exposed to recovery concepts and the sobriety model" and had "family and community support" do not adequately explain why Eric failed to meet the residential treatment criteria under the Substance-Related and Addictive Disorders CDG—such as whether Eric faced a current or imminent risk of relapse outside of residential treatment—especially in light of the type of symptoms and home environment concerns that were present after January 31, 2015. Therefore, the court cannot determine whether Dr. Jones's reasoning and conclusions are supported by substantial evidence.

The same is true of the external reviewer's determination. The external reviewer stated that Eric's "why now" factors could be treated in a lower level of care because Eric was not "psychiatrically decompensated such that he is a danger to himself or others," he "ha[d] no comorbid medical instability that would require 24 hour per day care," and he had a supportive home that did not contain "pathological substance use or other forms of abuse."[141] However, United's CDGs did not require proof that Eric was "psychiatrically decompensated" and dangerous or that he had a symptom or "comorbid medical instability" that required 24-hour care for Eric's residential treatment for substance dependence to be covered.[142] And the external reviewer's conclusion that substance abuse issues were absent in Eric's home environment after January 31, 2015, lacks adequate support for reasons already discussed above. Thus, although the external reviewer concluded that Eric's "why now" factors no longer evinced a need for residential treatment, the reasons provided for that conclusion do not adequately show that the

---

[141] *Id.* at 2906.

[142] In fact, most of the CDGs the external reviewer allegedly considered specifically required that Eric was *not* a danger to himself or others for residential treatment to be appropriate. *See id.* at 561, 2955, 3017.

external reviewer evaluated all of the proper criteria for admission to residential treatment or explain why Eric failed to meet them.

For these reasons, the court is unable to determine whether United's denial of coverage is supported by substantial evidence and, thus, must find that it was arbitrary and capricious. Because Plaintiffs succeed on their ERISA claim, there is no need to consider their Parity Act claim.

## II.     The Proper Remedy on this Record is to Remand to United.

Having determined that United's denial of coverage was arbitrary and capricious, the court must determine the appropriate remedy. When a plan administrator has acted arbitrarily and capriciously, the court can "either remand the case to the administrator for a renewed valuation of the claimant's case, or it can award retroactive reinstatement of benefits."[143] Which remedy is proper "depends upon the specific flaws in the plan administrator's decision."[144] Remanding the case to the administrator for further findings or explanation is proper "if the plan administrator failed to make adequate findings or to explain adequately the grounds of its decision."[145] A retroactive reinstatement of benefits, on the other hand, "is proper where, but for the plan administrator's arbitrary and capricious conduct, the claimant would have continued to receive the benefits" or "where there [was] no evidence in the record to support a termination or denial of benefits."[146]

Here, United failed to make adequate findings and adequately explain why Eric did not meet the criteria for residential treatment after January 31, 2015. Specifically, the reviewers did

---

[143] *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006).

[144] *Id.*

[145] *Id.* (cleaned up).

[146] *Id.* at 1176 (internal quotation marks omitted) (alteration in original).

not adequately address why Eric's "why now" factors related to his substance abuse and risk of relapse—his multiple previous failures in lower levels of care, his home environment, and his inability to apply adequate relapse-prevention strategies—no longer evinced a need for residential care. Although there is some evidence that some of the reviewers' reasons for denying coverage are contradicted by the record, the primary issue with the denials is that the lack of adequate explanation with regard to the proper coverage criteria leaves the court unable to determine whether there was sufficient evidence in the record to support United's denial.[147] Accordingly, the matter is remanded to United to make a determination applying the correct coverage criteria for Eric's substance abuse issues and a complete explanation as to whether and at what point Eric no longer satisfied them.

### III.   Prejudgment Interest Is Not Appropriate Here.

Prejudgment interest is "appropriate when its award serves to compensate the injured party and its award is otherwise equitable" and is "considered proper in ERISA cases."[148] The Tenth Circuit has stated that prejudgment interest is "generally available to compensate the wronged party for being deprived of the monetary value of his loss from the time of the loss to the payment of the judgment."[149] Because the court remands this matter to United for further consideration rather than awarding benefits, prejudgment interest is not warranted.

---

[147] *See id.* at 1175–76.

[148] *Allison v. Bank One-Denver*, 289 F.3d 1223, 1243 (10th Cir. 2002), *as amended on denial of reh'g* (June 19, 2002).

[149] *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1286 (10th Cir. 2002) (quotation marks and citations omitted).

**IV.    Attorney Fees and Costs Are Awarded to Plaintiffs.**

ERISA authorizes the court to exercise discretion in awarding attorney fees to either

party.[150] There is no requirement that a party first prevail to be eligible to receive an award.[151]

The court may award fees "as long as the fee claimant has achieved 'some degree of success on

the merits.'"[152] The Tenth Circuit has established five factors for the court to consider in making

this determination:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing
> party's ability to satisfy an award of fees; (3) whether an award of fees would deter
> others from acting under similar circumstances; (4) whether the party requesting
> fees sought to benefit all participants and beneficiaries of an ERISA plan or to
> resolve a significant legal question regarding ERISA; and (5) the relative merits of
> the parties' positions.[153]

"No single factor is dispositive and a court need not consider every factor in every case."[154]

Considering these factors, Plaintiffs are entitled to attorney fees and costs. First, United is

culpable for repeatedly failing to adequately explain why Eric failed to meet the proper

residential treatment criteria, despite Plaintiffs' pointing out the error during the appeals

process.[155] In short, this lawsuit was necessary because of United's missteps.[156] Second, United's

ability to satisfy an awards fee "is not seriously in question."[157] Third, an award of fees against

---

[150] 29 U.S.C. § 1132(g)(1).

[151] *Cordova v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1207 (10th Cir. 2013).

[152] *Id.* (citation omitted).

[153] *Id.*

[154] *Id.*

[155] *See* AR 1035–36, 1606.

[156] The court notes that it is not making a finding of bad faith.

[157] *James C.*, 499 F. Supp. 3d at 1125 n.137. "While the court does not assign any weight to this factor, it clearly does not weigh against an award of fees and costs." *Id.* (citing cases supporting the same).

United would reasonably be expected to deter it and others from these failings.[158] Fourth, the court finds that Plaintiffs' case is not focused on benefitting all members of the Plan or seeking to resolve an important legal question; the case is firmly fixed on the Plaintiffs herein. Fifth, as discussed in this opinion, the court has agreed with Plaintiffs' position that United's denial of benefits was arbitrary and capricious. Therefore, Plaintiffs are entitled to reasonable attorney fees and costs incurred to prosecute this matter.[159]

## ORDER

For the reasons stated in this Memorandum Decision and Order:

1. Defendants' Motion for Summary Judgment is DENIED;

2. Plaintiffs' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

    a. The court GRANTS Plaintiffs' request to find United's denial of benefits arbitrary and capricious.
    b. The court DENIES Plaintiffs' request for an order awarding benefits under the Plan.
    c. The court DENIES Plaintiffs' request for prejudgment interest.
    d. The court GRANTS Plaintiffs' request for attorney fees.

3. Defendants' decisions denying Plaintiffs benefits for Eric's treatment at Vista are VACATED and this matter is remanded back to United for further proceedings consistent with this decision.

Signed December 15, 2021.

BY THE COURT

David Barlow
United States District Judge

---

[158] *See id.* at 1125 n.138; *Spradley v. Owens-Illinois Hourly Employees Welfare Benefit Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012).

[159] *See* 28 U.S.C. § 1920 (describing taxable costs).